IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DIANA L. BRAGG,

        Plaintiff,

      v.                           Civil Action No. 2:05-CV-71

MICHAEL ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.    Background

      Plaintiff, Diana L. Bragg, (Claimant), filed her Complaint on September 19, 2005,

seeking Judicial review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision

by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his

Answer on November 22, 2005.[2]  Claimant filed her Motion for Summary Judgment on

December 22, 2005.[3]  Commissioner filed his Motion for Summary Judgment on February 17,

2006.[4]

B.    The Pleadings

      1.    Claimant's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 9.

[4] Docket No. 16.

2.    <u>Commissioner's Motion for Summary Judgment</u>.

C.    <u>Recommendation</u>

I recommend that:

1.    Claimant's Motion for Summary Judgment be DENIED.

2.    Commissioner's Motion for Summary Judgment be GRANTED.  The Administrative Law Judge (ALJ) properly determined that Claimant's obesity - alone or in combination with other impairments - was not a severe impairment and did not meet or equal a Listing.  Furthermore, the ALJ's characterization of Claimant's sit/stand need was proper.  Finally, the ALJ's hypothetical posed to the Vocational Expert (VE) was proper and the ALJ reasonably relied on the VE's affirmative response as to the availability of jobs in the national economy.   In this case, there is substantial evidence to support the ALJ's decision such that it should be affirmed.

## II.  Facts

A.    <u>Procedural History</u>

 Claimant filed an application for Supplemental Security Income Benefits and Disability Insurance Benefits on November 25, 2002, alleging disability since October 12, 2002.  The applications were initially denied on April 4, 2003 and on reconsideration on July 2, 2003.  Claimant requested a hearing before an ALJ and received a hearing on March 18, 2004.  On June 4, 2004, the ALJ issued a decision adverse to Claimant.  Claimant requested review by the Appeals Council but was denied.  Claimant filed this action, which proceeded as set forth above.

B.    <u>Personal History</u>

Claimant was 45 years old on the date of the March 18, 2004 hearing before the ALJ.

Claimant completed high school and four years of college. Claimant has prior work experience as a case manager/behavioral health worker, cook/clerk at a snack bar and a park attendant.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: October 12, 2002 through June 4, 2004.

**Joe Othman, M.D., 2/08/00, Tr. 452**
Impression: EMG and NCS of the lower extremities and the lumbar paraspinals are within normal limits. Clinically, the patient's symptoms are probably related to torn ligaments and tendons, will give the patient series of trigger points.

**Arturo Sabio, M.D., 2/26/03, Tr. 456**
Diagnostic impression: Hypertension controlled, hypothyroidism, degenerative disc disease, depression and morbid obesity.

Summary: She had an EKG because of chest pains. This was reported as normal. On the examination, her blood pressure was 132/82. The rest of her vital signs were normal and stable....On this examination, the patient was noted to be grossly overweight at 305 pounds on a 4 feet 11 inches frame. She is morbidly obese and this may be due to the hypothyroidism....The patient complains of depression since 1985. On this examination, the patient was able to interact normally with the examiner....She complained of low back pain which has been worse over the past two years. She relates that the pain is worsened by ambulation, by bending and by lifting or even by prolonged sitting. On this examination, there was tenderness over the spinous processes of the lumbar spine and over the sacroiliac joints on both sides....There was also restriction of knee flexion but it appeared to be due to obesity on both legs rather than due to pain in her knees. The patient was able to walk on the heels, on the toes and heel-to-toe in tandem. She was able to stand on either leg separately. She was able to squat fully. Fine manipulation movements were normal. Deep tendon reflexes were normal. There was no muscle atrophy or weakness. The right handgrip was only 22 kg forces compared to 24 kg force on the left.

**Hugh M. Brown, M.D., 3/31/03, Tr. 462**
Physical RFC
Primary diagnosis: chronic low back pain
Secondary diagnosis: obesity
Other alleged impairments: hypertension
Exertional limitations:
       Occasionally: 50 pounds
       Frequently: 25 pounds
       Stand and/or walk: at 6 hours in an 8-hour workday
       Sit: about 6 hours in and 8-hour workday

Push and/or pull: unlimited, other than as shown for lift and/or carry.
Postural limitations:
    Climbing: Occasionally
    Balancing: Occasionally
    Stooping: Occasionally
    Kneeling: Occasionally
    Crouching: Occasionally
    Crawling: Occasionally
Manipulative limitations: None established
Visual limitations: None established
Communicative limitations: None established
Environmental limitations: None established
Symptoms: Considered degree of subjective pain and in view of the objective findings - pg. 2 and 3 - and the obesity the RFC is reduced to medium work activity.

**Joseph A. Snead, M.D., 5/10/02, Tr. 472**
Diagnosis: Degenerative changes in cervical spine at C4-5 and C5-6.  No rotator cuff tear visible on MRI.  Cervical degenerative arthritis that's causing neck and posterior scapula pain and bursitis that's causing shoulder pain.

**Constantino Y. Amores, M.D., 10/25/02, Tr. 474**
Diagnosis: Lumbar/Lumbosacral Spondylosis (ICD-721.3).  Co-morbidities include Chronic Lumbar Strain, Intermittent Lumbar Root Syndrome, GERD, Depression.

**Thomas A. Lauderman, M.D., 6/5/03, Tr. 482**
RFC Assessment
Primary diagnosis: chronic low back pain
Secondary diagnosis: obesity
Exertional limitations:
    Occasionally: 50 pounds
    Frequently: 25 pounds
    Stand and/or walk: at 6 hours in an 8-hour workday
    Sit: about 6 hours in and 8-hour workday
    Push and/or pull: unlimited, other than as shown for lift and/or carry.
Postural limitations:
    Climbing: Frequently
    Balancing: Frequently
    Stooping: Frequently
    Kneeling: Frequently
    Crouching: Frequently
    Crawling: Frequently
Manipulative limitations: None established
Visual limitations: None established
Communicative limitations: None established

Environmental limitations: None established
Symptoms: Claimant has back pain; takes lorcut for pain; RFC reduced to medium.

**Samuel W. Goots, Ph.D., 6/27/03, TR. 492**
Results of Psychiatric Review Technique
Medical Dispositions: Impairments not Severe
Category which the Medical Disposition is Based: Affective Disorders
Affective Disorders - Depression (probably related to pain)
Restriction of Activities of Daily Living - Mild
Difficulties in Maintaining Social Functioning - Mild
Difficulties in Maintaining Concentration, Persistence or Pace - Mild
Episodes of Decompensation, Each of Extended Duration - None

**Robert P. Marinelli, Ph.D., 3/26/03, Tr. 507**
Results of Psychiatric Review Technique
Medical Dispositions: Impairments not Severe
Category which the Medical Disposition is Based: Affective Disorders
Affective Disorders - Depression
Restriction of Activities of Daily Living - None
Difficulties in Maintaining Social Functioning - Mild
Difficulties in Maintaining Concentration, Persistence or Pace - Mild
Episodes of Decompensation, Each of Extended Duration - None

**Attending Physician, Webster County Memorial Hospital, Tr. 522**
8/12/02 - Diagnosis: muskuloskeletal back pain; R carpal tunnel.
8/26/02 - Diagnosis: muskuloskeletal back pain; obesity.
9/4/02 - Diagnosis: obesity; chronic back pain.
10/18/02 - Diagnosis: muskuloskeletal back pain; chronic pain syndrome.
10/31/02 - Diagnosis: muskuloskeletal back pain; hypothyroidism.
12/2/02 - Diagnosis: persistent back pain
1/16/03 - Diagnosis: severe back pain; depression.
5/2/03 - Diagnosis: persistent back pain; metatarsal pain in foot.
6/13/03 - Diagnosis: hypertension; chronic back pain
7/15/03 - Diagnosis: infected and left wrist; chronic neck and pain; hypertension.
8/1/03 - Diagnosis: Persistent neck pain
8/7/03 - Diagnosis: chronic neck pain and radiolopathy; chronic lumbar pain.

**Wilson Tan, M.D., 5/2/03, Tr. 642**
Impression: No abnormal bone pathology involving the lumbosacral spine.

**Wilson Tan, M.D., 1/28/03, Tr. 643**
Impression: No acute disease.

**Alan M. Lintala, M.D., 10/1/03, Tr. 703**

Impressions: 1) Posterior right-sided protrusion of C5-6 intervertebral disc possibly in combination with tiny marginal osteophytes resulting in encroachment on right C5-6 neural foramen and possible nerve root impingement; 2) Mild posterior right-sided bulging of C6-7 intervertebral disc possibly in combination with tiny marginal osteophytes resulting in encroachment on right C5-6 neural foramen and possible nerve root impingement; 3) Mild posterior central bulging of C4-5 intervertebral disc possibly in combination with tiny marginal osteophytes resulting in encroachment on right C5-6 neural foramen and possible nerve root impingement.

**Alan M. Lintala, M.D., 10/29/03, Tr. 705**
Impression: 1) Mild posterior bulging of L4-5 intevertebral disc along with ligamentous thickening and facet hypertrophy resulting in encroachment of bilateral L4-5 neural foramina and possible nerve root impingment; 2) Mild cocentric bulging of L5-S1 intervertebral disc along with facet hypertrophy resulting in mild effacement of lumbar thecal sac and possible nerve root impingment.

**Attending Physician, Webster County Memorial Hospital, 2/16/04, Tr. 712**
Diagnosis: persistent pain; chronic back pain; hypertension.

**Attending Physician, Webster County Memorial Hospital, 11/12/03, Tr. 719**
Diagnosis: bilateral carpal tunnel; persistent back pain.

**Attending Physician, Webster County Memorial Hospital, 8/27/03, Tr. 721**
Diagnosis: persistent neck (cervical) pain; bilateral carpal tunnel.

**Debra Blake, PA-C/Robert Mace, M.D., 2/29/04, Tr. 725**
Residual Functional Capacity Assessment
Present diagnosis: muskuloskeletal back pain and radiolopathy and cervical pain.
Limitations: No Heavy Work; No Medium Work; No Light Work; Sedentary Work OK, but patient has to be able to change positions; move or lie down due to pain.
Patient must alternate positions frequently, as patient cannot tolerate strain in sustained positions of neck and back.
Patient needs sit/stand option, as this helps reduce pain.
Patient cannot sit for more than 15-30 minutes, stand for more than 15-30 minutes and walk for more than 15 minutes.
It is advisable/necessary for patient to recline or lie down during day with feet up.
It is advisable/necessary for patient to have frequent rest periods sitting during the day.
Patient is restricted from performing the following activities due to physical impairments alone:
      Never: climbing, balancing, kneeling, crouching, crawling, squatting
      Infrequent: stoop/bend, stretching, reaching.
Patient expected to experience chronic, severe pain on basis of impairments found.
Patient cannot use feet/legs for repetitive movements such as pushing or pulling leg/feet controls.
Patient cannot use hands for repetitive action where arm controls and fine manipulations are involved...due to loss of grip strength and numbness.

Patient not capable of performing any full-time job that is 8 hours per day, five days per week on sustained basis because patient cannot even carry out activities of daily living - she sleeps sitting up in a chair at times.

Patient was disabled from 10/12/02 and continues to be at this time.

**Michael D. Morrello, M.S., 2/24/04, Tr. 740**

Summary/Recommendations: Cognitive functioning measured within average range. Her achievement scores were commensurate with her ability scores. Personality testing indicates somatic complaints, depression, and anxiety. She reports depressive symptoms that were measured within the severe range. She reports anxiety symptoms that were measured within the mild range. Her visual-motor functioning appears to be within the average range.

**Michael Morrelli, 3/14/04, Tr. 745**

Mental RFC Assessment

Limitations in understanding, remembering and carrying out instructions: Slight to moderate. Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines - Moderate; her depressive symptoms would make it difficult for her to complete the tasks above.

Limitations in social functioning in a normal competitive work environment: Slight to moderate. Limitations in work adjustment: moderate. Stress may increase her depressive symptoms which are severe with suicidal.

**Michael Morrello, 3/14/04, Tr. 746**

Psychiatric Review Technique

Medical Summary: Affective Disorders. Depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbances, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide.

Rating of Functional Limitations: Restriction of Activities of Daily Living - Marked; Difficulties in Maintaining Social Functioning - Moderate; Difficulties in Maintaining Concentration, Persistence or Pace - Moderate; Repeated Episodes of Extended Duration - One or Two.

"C" Criteria of the Listings - A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

D.    Testimonial Evidence

Testimony was taken at the March 18, 2004 hearing. The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 49)

Q      Have you worked at all since 10/02?

A      No.

Q      Have you applied for any work?

A      No.

Q      Your height and weight?

A      4' 11 and 3/4" and right now I weigh 242.

Q      Okay.  Have you lost or gained weight?

A      I've lost weight.

Q      And how many are you down?

A      I've lost 64 pounds.

Q      Was that voluntary?

A      Yes.

                    *                    *                    *

Q      Do you have a driver's license, Ms. Bragg?

A      Yes.

Q      How many miles do you drive in a typical week?

A      Maybe 15 or 20.

                    *                    *                    *

Q      Okay.  Now I'd like for you to tell me whether you've had difficulty controlling your weight during the time that this claim covers which is October 12, 2002 up through the present?  When you indicated that you'd lost the 60 pounds, over what period of time did you lose it?

A  Okay, after I had quit my job there in 2002 I went on - - I had gained weight there up to the 306 and in July of last year 2003 I started back on trying to really get into losing the weight and stuff. That's when I started losing.

Q  Were you on the drug Redox [phonetic] for a while?

A  I was but it was a few years back.

Q  Okay. And have you gained and lost similar to this in the past?

A  Yes.

Q  What's the lowest you were able to get down, say, in the past few years?

A  About four years ago I got down to 220.

Q  Was there anything that you know of that caused your weight to go back up to 306 after you had lost it?

A  No, just when I hurt I eat.

Q  Okay. Now the medications on your list apparently have just been changed. I know I'm skipping around a little bit. But are they current?

A  Yes.

Q  And you are on two pretty strong pain medications?

A  Yes.

Q  Now what are those pain medications prescribed for you to help?

A  The pain in my lower back and my neck, my middle back.

Q  Okay, so you have low back pain and then you said middle back pain and then neck?

A  Yeah.

Q      Okay, what about stairs, do you have any difficulty climbing stairs?

A      Yeah, I don't do stairs hardly any.

Q      Well, you can get in and out of a car - -

A      Yeah.

Q      - - so we'll count that as one step.  What about getting in and out of your house, do you have to go up any steps to do that?

A      Yeah, I've got four steps in the house.

Q      Okay, any difficulty getting up those four steps?

A      Yeah, I do.  They're kind of steep steps and I usually have to go up, you know, and put both feet on one step and then pick one foot up and go to the next one and put the next foot up.

Q      Can you get into your house without a guardrail, in other words, can you just walk up the steps or do you need any kind of support from a guardrail?

A      I don't have a guardrail so I make it in there.

Q      All right.  How many more steps than that do you think you could climb without getting into any real difficulty, if you know?

A      I really don't know but I don't think - -

Q      You just - -

A      - - very many more.

Q      - - you just avoid steps?

A      Yeah.

Q       Okay.  What about lifting and carrying?  Now I know you've got several problems that might be related to that but just as a rule in lifting, I mean using both hands, approximately how much do you feel that you could lift and carry on a regular basis without causing yourself pain or strain?

A       Well, I know like lifting a gallon of milk will hurt my back and - -

Q       Do you ever get involved in things like putting groceries away or bringing in groceries from the car - -

A        No - -

Q       - - or from a - -

A       - - my husband does all that.

Q       He does that.  Okay, what about household chores, cooking, cleaning, laundry, vacuuming, making beds, things like that, are you able to do that in your own home?

A       Most of it my husband helps me do or winds up doing it.  Like the vacuuming he does that.  And the laundry, we take it to the laundromat and he goes with me and carries the clothes in and carries them back out.  The cooking, I've cut it back quite a bit to mostly just quick easy stuff to fix.

*              *              *

Q       You don't know, okay.  What about concentrating on things like maybe reading a book or a magazine or watching a television program or a movie, do you have any difficulty as far as keeping your thoughts focused or paying attention to what you're doing?

A       I don't pay much attention to anything anymore.  When I was trying to crochet and stuff like I couldn't remember what I was doing.  I kept constantly putting stuff down and

going back and rereading and trying to do stuff.  But if I try reading I'll lose my place where I'm reading at.  I don't watch TV very much because I usually lose what's going on.

Q      Okay.  Well, now that brings me to a question, you mentioned crocheting, how much crocheting were you doing during the time period that we were talking about, October 2002?

A      Actually I started crocheting that November of 2002 because I couldn't do anything else.  My mom was showing me how to do some of it.   But in February my hands got so they would just, 2003, they just got to they was getting numb every time I'd take a crochet few stitches and I would have to put them down.  So I haven't been doing anymore crocheting, just put it up.

*               *               *

[EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE]
(Tr. 81)

Q      Would you please describe Ms. Bragg's past relevant work?

A      Yes, Your Honor.  The last job she had was a case manager for Seneca.  That's a semi-skilled job with transferabililty of skills.  That's at the light level.  She also was employed as a cook/clerk in a semi-skilled capacity at the light level.  And as a park attendant worked there at the light level, semi-skilled, Your Honor.

Q      Please assume a younger individual with a college education.  Precluded from performing all but sedentary work.  With occasional posturals primarily gross grasping strength, I mean activities as opposed to repetitive fine manipulation.  No repetitive overhead reaching. No foot pedals.  No hazards.  And work that is unskilled and low stress defined as one and two

step processes, routine and repetitive tasks primarily working with things rather than people, entry level. The hypothetical is sedentary. Vocational posturals primarily gross grasping activities. No repetitive overhead reaching. No usage of foot pedals. No hazards and low stress. With those limitations, sir, can you describe any work this hypothetical individual can perform?

A     Yes, may I have a moment or two - -

Q     Sure.

A     - - Your Honor.

Q     I forgot to add the sit/stand option, Mr. Panza [INAUDIBLE].

A     Okay. I'm ready, Your Honor.

Q     All right, go ahead.

A     Your Honor, considering the hypothetical you've given to me for comment it would be my testimony the jobs would exist in the national economy and also the state economy consistent with that hypothetical. The first category of jobs would be that of a surveillance system monitor operator at the sedentary level. At least 700,000 jobs in the national economy and at least 4000 in the state of West Virginia. That position is consistent with the DOT. The other position is that of an inspector and marker at the sedentary level, unskilled for which there are at least 50,000 jobs in the national economy, at least 300 jobs in the state economy. And those jobs are located in the garment, pharmaceutical, and small component manufacturing industries. That job is not listed as such in the DOT but based upon my experience, my training, and surveys of employers, et cetera, those jobs do exist in the national and state economies.

Q     Okay, what was the first job you named, Mr. Panza?

A     Surveillance system monitor.

Q How much weight is actually involved in that job although classified as sedentary?

A Very minimal, Your Honor, probably five pounds, five to ten pounds at the most.

Q The claimant's, Mr. Panza, the claimant's long time treating - - how long have you been seeing Dr. Mace, Ms. Bragg?

CLMT I don't know.

ALJ [INAUDIBLE] ten years?

CLMT Yeah.

BY ADMINISTRATIVE LAW JUDGE:

Q Long time treating physician, family practitioner's completed an RFC in Exhibit 25F, that we earlier referenced but not the content of it, in which he stated the claimant can only do sedentary work but had to have a sit/stand option, or as they said, Ms. Mace - - Mr. Mace and Ms. Blake, to move about. But what I'm getting to is that the doctor said that she would have to have frequent rest periods. How many, and they're not defined, but now many rest periods is normal in the jobs you named, for example?

A Usually two breaks of 15 minutes each per day in addition to a lunch period.

Q The doctor also stated the claimant had - - so if she had to rest more than two times and plus the lunch those jobs would be ruled out?

A Yes, Your Honor.

Q They also stated the claimant had to recline or lie down during the day with her feet up. Would that job, would those jobs allow for lying down during the day with the feet elevated?

A        No, Your Honor.

Q        As Ms. Van Nostrand indicated, we don't have an MRFC, mental RFC.  Cardinal was do - - did one at her request.  But if there were moderate limitations or that might cumulate to impaired concentration, based on the claimant's testimony here today, if she can't stay on task one-third to two-thirds of the day due to impaired concentration are those jobs affected?

A        Yes, they're affected and it would remove those jobs as well as any other jobs.

ALJ     Okay, Ms. Van Nostrand.

*                    *                    *

[EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY]  (Tr. 84)

Q        All right.  If that hypothetical were one-third to one-half - -

A        Which hypothetical are you referring to , I'm sorry?

Q        The last - -

A        Okay.

Q        - - assumption the Judge gave you where he indicated off task one-third to two-thirds of the time.  If I change that to one-third to one-half of the time would that make any difference?

A        My testimony would be the same.

Q        Would be the same, all right.  Okay, now going back to the start of your testimony when you were characterizing the case manager she testified that she sat pretty much all day and I'm wondering - - apparently the DOT would class that job as light level, is that right?  Case manager, semi-skilled.

A        Yes.

Q        Okay.  In the way she performed it did it sound more like a sedentary position the way she - -

A        Well, it depends on how much time she was sitting.  The standard is six hours sitting and two hours standing.

*                *                *

ALJ        But if she performed it as sedentary, let's assume that was true, Ms. Van Nostrand, what's your question to Mr. Panza?  Does it just change the classification - -

ATTY        Yeah, just change - -

ALJ        Okay, that's fine.

ATTY        - - of that particular job.

ALJ        Okay.

ATTY        In other words, as I understand it, that you look at it two ways, the way person did it - -

ALJ        Right.

ATTY        - - and the way it's usually done.

ALJ        Right.

VE        Yes, and then there's a sit/stand option associated with that because the person can either get up or sit, whatever.

*                *                *

Q        - - the one, the first one upon which you identified these jobs.  I'm going to change the degree of some of these posturals that were given to you.  In the never category, now this doesn't mean never like putting on shoes and socks and getting up and down from a chair at

16

home, but as part of the job this person should never be required to do any climbing, balancing, kneeling, crouching, crawling, or squatting.  And infrequently as defined as only a few times in an eight hour day so that would be rare.  The person should not stoop or bend, stretch or reach.  And, of course, the stoop or bend is the lower extremities pretty much and the stretch and reach involves the upper extremities.  Now I'm wondering if these positions that you identified would be - - whether these assumptions would have any affect on the positions you identified?

      A       And how do you identify or define reaching?  To what - -

      Q       Reach - -

      A       - - to what degree?

      Q       To what degree?  Reaching such as in any direction, in other words, reaching out in front, overhead, out to the side, and it's primarily - -

      A       How far from one's body would one - - how would you define that in terms of - -

      Q       And - -

      A       - - either moving - -

      Q       - - that is - -

      A       - - their head or arms?

      Q       - - getting your elbows away from your chest area.

      A       Well, I think both of those jobs would be difficult to do if that were the case and more likely, more than likely would remove those jobs.  Without special accommodation, of course, those are not to be considered.

      Q       Okay.  In another place in the assessment the person says grasping, no arm controls, no fine manipulation.  Yes, on loss of grip strength.  Yes, numbness in the hands.

Would your answer be the same?

A       I'm sorry, you lost me there.  Where - -

Q       Okay.

A       - - are you reading?  I don't - -

Q       In other words - -

A       - - know what you're - -

Q       - - we have a - -

A       - - referring to.

Q       - - a postural restriction of infrequently reaching and stretching and we've talked about that as getting your arms out away from your body, I mean a few times in an eight hour day.  We also have a more specific description of her ability to use her hands and arms.  No arm controls,  no - -

A       And what do you mean by no arm controls?  You're talking about supplementary controls or someone using their arms?

Q       Using your arms.

A       Oh, okay, okay.

Q       I'm sorry, that - -

A       Okay.

Q       You know, such as reaching out to pull a lever or maybe driving with your arms out in front of you.  And it says that the job should not have repetitive or prolonged use of the hands for fine manipulation, arm controls, and that this person has some loss of grip strength and numbness in both hands.  Would that have any impact on those jobs?  I know you've already

ruled them out on the reaching but just looking at these.

A     Well, if they would have limited use of their arms and hands then that would eliminate both of those jobs.

E.     Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

Cooks foods such as eggs, cereal, soups, sandwiches, potatoes, meat in an oven.  (Tr. 63)

Crochets and does needlework.  (Tr. 72, 190)

Reads Woman's Day Magazine or similar materials.  (Tr. 79)

Dresses.  (Tr. 188)

Performs cleaning activities such as laundry, washing dishes.  (Tr. 189)

Pays bills and manages bank accounts.  (Tr. 189)

Shops for food, clothing and medications.  (Tr. 190)

Visits mother's house once per week.  (Tr. 191)

Talks to friends on the phone.  (Tr. 191)

Has a driver's license and is able to drive a car.  (Tr. 50)

Morbidly obese: 4' 11" frame; weight fluctuates between 220 - 305 pounds.  (Tr. 53, 456).

### III.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence.  The Court has construed Claimant's brief to allege three instances of error on the ALJ's part: 1) the ALJ erred in her evaluation of Claimant's obesity;  2) the ALJ failed to comply with Social Security Ruling (SSR) 96-9p by failing to specify to the VE the frequency of Claimant's sit/stand needs; 3) the ALJ erred in Step Five of the analysis by incompletely listing Claimant's impairments in the hypothetical and by relying on the VE's affirmative response to the hypothetical.

Commissioner contends the ALJ's decision is supported by substantial evidence and should therefore be affirmed.  Specifically, Commissioner responds that 1) the ALJ properly evaluated and considered Claimant's obesity throughout the sequential analysis;  2) the ALJ's failure to specify Claimant's sit/stand needs to the VE was insignificant due to the fact that the jobs cited by the VE accommodated Claimant's sit/stand needs; 3) the ALJ's hypothetical question was proper and the ALJ reasonably relied on the VE's affirmative response.

B.      The Standards.

1.      Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2. <u>Judicial Review</u>. Only a final determination of the Commissioner may receive judicial review. <u>See</u>, 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3. <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4. <u>Social Security - Medically Determinable Impairment</u>. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423©; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6. <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to

determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to

show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th

Cir. 1984).

C.      Discussion

        1.      Whether the ALJ Erred in Evaluating Claimant's Obesity

        Claimant contends the ALJ erred by failing to qualify her obesity as a severe impairment;

by failing to find her obesity met or equaled a listing; by failing to call a medical expert at the

hearing to determine whether her obesity, when combined with other impairments, equaled a

Listing.  Commissioner counters that the ALJ's consideration of Claimant's obesity was proper

at every stage of the sequential analysis.

            i.      Alleged Error in Failing to Qualify Claimant's Obesity As a Severe
                    Impairment

        An impairment is severe when, whether by itself or in combination with other

impairments, it significantly limits a claimant's physical or mental abilities to perform basic

work activities.  20 C.F.R. §§ 404.1520©, 404.1521(a), 416.920(c), 416.921(a).  "The claimant's

maladies must be considered in combination and must not be fragmentized in evaluating their

effects."  Hicks v. Gardner, 393 F.2d 299, 302 (1968).

        Obesity, by itself, is not inherently a severe impairment nor is there a specific level of

weight or BMI that equates with a severe or non-severe impairment.  (SSR) 02-1p (2002).

Rather, obesity qualifies as a severe impairment, "when, alone or in combination with another

medically determinable physical or mental impairment(s), it significantly limits an individual's

physical or mental ability to do basic work activities."  Id.  Accordingly, an ALJ must do an

"individualized assessment of the impact of obesity on an individual's functioning when

deciding whether the impairment was severe."  Id.

In the present case, the ALJ determined that Claimant suffered from the following severe impairments: discogenic disorders of the cervical and lumbar spine without surgery; bilateral carpal tunnel with right release in March 2004 and left carpal tunnel release in January 2004; high blood pressure controlled with medication; mild shoulder problems; foot and heel spurs and left plantar capsulitis/metatarsalgia treated with orthotics; depressive disorder; chronic pain syndrome with neck and back pain; history of allergic rhinitis and gastroesophageal reflux disease; hypothyroidism and osteoarthritis. (Tr. 25). The ALJ did not conclude Claimant's obesity - alone or in combination with other impairments - qualified as a severe impairment.

Claimant argues the ALJ's determination as it related to her obesity was erroneous. In support of her argument, Claimant directs this Court's attention to medical data regarding Claimant's height and weight as well as to physicians' reports diagnosing Claimant with morbid obesity. (Tr. 416, 456, 532). Claimant's emphasis on such evidence is unnecessary as the ALJ did not dispute that Claimant was obese nor that her obesity exacerbated other impairments including her back pain and knee pain.[5] Rather, the ALJ's failure to qualify Claimant's obesity as a severe impairment stemmed from her conclusion that Claimant's obesity - either alone or in combination with other impairments - did not sufficiently limit Claimant's ability to do basic work functions. In explaining her reasoning, the ALJ noted that Claimant had been able to work in the past with her obesity and modest musculoskeletal irregularities. (Tr. 21). Additionally,

_____

[5] The ALJ noted in her opinion that Claimant's obesity was related to other impairments. In regards to Claimant's alleged knee pain, the ALJ relied on medical records when commenting that "claimant's obesity was considered a possible factor in the decreased range of motion." (Tr. 20, 456). In regards to Claimant's back pain, the ALJ relied on medical records when commenting "the claimant has been obese for a very long time, and her complaint of back pain was attributed to the obesity." (Tr. 21, 522).

the ALJ noted that despite being obese, Claimant retained the ability to ambulate with a normal gait and retained the use of her upper extremities. (Tr. 26, 456). Numerous medical reports document that Claimant fell within the normal range mentally and physically. (Tr. 456, 462, 482, 492, 507, 642, 643). The ALJ carefully considered Claimant's obesity - alone and in combination with other impairments - before determining it was not a severe impairment. Her ultimate determination is supported by substantial evidence.

ii.     Error in Failing to Find Claimant's Obesity Met/Equaled a Listing

Claimant alleges that the ALJ erred by failing to find that her obesity gave rise to an impairment that met or equaled a Listing. Specifically, Claimant argues that "the combination of extreme obesity with lumbar spinal impairments causing intermittent radicular symptoms to the lower extremities together with foot problems and cervical spinal impairments causing intermittent radicular symptoms to the upper extremities together with bilateral carpal tunnel syndrome, might well combine to equal a Listing."

Obesity is not a separately listed impairment. SSR 02-1p (2002). Accordingly, a claimant with obesity meets the requirements of a listing if "there is an impairment that, in combination with obesity, meets the requirements of a listing." Id. Equivalence may result "if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of the listings, but the combination of impairments is equivalent in severity to a listed impairment." Id.

The ALJ in the present case concluded that Claimant's severe limitations did not meet or equal the requirements of a Listing (including Listing 1.04A). (Tr. 25, 26). The ALJ's

determination was based on a careful consideration of the medical evidence and hearing testimony and as such is based on substantial evidence. (Tr. 26, 27, 28). Most generally, the ALJ concluded that Claimant's subjective impressions of pain and symptoms were inconsistent with Claimant's diagnoses throughout the years. Specifically, she concluded "there is typically little noted in the way of any corresponding clinical or other objective findings to support the degree of limitations and pain alleged. . . . [T]he impairments in the muskuloskeletal area are noted as is the fact that the claimant has overall retained the ability to ambulate without the need for an ambulatory aide and she has significant residual functional use of her upper extremities." (Tr. 23, 26, 456, 707). In support of the ALJ's observations, this Court notes that while Claimant complained of pain and limited mobility, Dr. Sabio reported that Claimant retained a normal gait and normal range of fine manipulation movements and Dr. Brown and Dr. Lauderman both reported that Claimant could work at a medium level of work activity. (Tr. 462, 465, 482). Additionally, this Court notes that the ALJ carefully reviewed the records from Webster Clinic dated August 27, 2003 through February 20, 2004. (Tr. 23, 707). While the records showed that Claimant was repeatedly diagnosed with obesity and its frequently related impairments of back pain, carpal tunnel and hypertension, the ALJ properly observed that the diagnoses appeared largely derived from Claimant's subjective impressions of pain, which the ALJ was within her authority to question. (Tr. 23, 707); SSR 96-7p (1996).

Most significantly, however, this Court observes that a significant percentage of medical records document that Claimant fell within the normal range mentally and physically. (Tr. 456, 462, 482, 492, 507, 642, 643). Accordingly, while this Court does not dispute that Claimant's obesity impaired her ability to perform basic work functions, it is apparent the ALJ's

26

determination as to Claimant's obesity - both in regards to the severity of her obesity and in regards to the Listings - is supported by substantial evidence.

### iii. Error in Failing to Call A Medical Expert

Claimant alleges that the ALJ erred by not calling a medical expert at the hearing. As set forth in SSR 96-6p, an ALJ must obtain an updated medical opinion from a medical expert when "additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State Agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p (1996). Claimant argues that because additional evidence was received into the record after the state agency reports (see Tr. 462, 482) were completed, the ALJ had a duty to call a medical expert to resolve the issue of equivalency.

This Court finds that the ALJ was under no obligation to call a medical expert at the hearing. It is noted that the Claimant failed to specify precisely which records were unavailable to the state agency consultants at the time of their respective evaluations on March 31, 2003 and June 5, 2003. (Tr. 462, 482). This issue need not be resolved, however, as the ALJ did not rely on the referenced evaluations to any significant degree such that the unavailability of new evidence to the consultants at the time of their evaluations significantly effected the ALJ's determination as to the Listings. (Tr. 25). The ALJ relied on the medical records in their entirety and on her evaluation of Claimant's credibility as to past and present assertions of pain and limitations. At the conclusion of the hearing, the ALJ made a determination as to equivalency based on her readings and observations and concluded that a medical expert was not needed. As her decision to not call a medical expert is supported by substantial evidenced -

namely the careful analysis of the medical records and hearing testimony - it will not be disturbed.

       2.      <u>Whether The ALJ's Analysis at Step Five Was Faulty</u>

Claimant argues that the ALJ's analysis at Step Five was faulty. Specifically, Claimant alleges that 1) the ALJ failed to comply with SSR 96-9p by failing to include in her hypothetical question to the VE any specifications regarding the frequency of Claimant's need to alternate sitting and standing; 2) the ALJ's hypothetical insufficiently described Claimant's limitations; 3) the jobs cited by the VE in response to the ALJ's hypothetical did not accommodate Claimant's limitations. Commissioner responds that any failure on the part of the ALJ to include any such specifications as to Claimant's sit/stand needs was harmless; that the hypothetical referenced all of Claimant's limitations as they were determined by the ALJ; that the jobs identified by the VE accommodated Claimant's limitations.

After a claimant has met their burden of showing that they are not able to perform their past relevant work, the burden shifts to the Commissioner to show that the claimant is able perform a significant number of jobs in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572 (4th Cir. 1976). To complete this analysis, the ALJ must consider the claimant's RFC as well as vocational factors including the claimant's age, education and work experience, skills. 20 C.F.R. § 404.1520. The ALJ is responsible for determining the claimant's RFC and for reasonably setting forth in the hypothetical posed to the VE all of the claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir. 1989); SSR 96-5p (1996). Where an individual's RFC is less than the full range of sedentary work due to a need to alternate sitting and standing, the ALJ must be specific in the hypothetical posed to the vocational expert as to the claimant's

need to alternate sitting and standing.  SSR 96-9p (1996).  Based on the information contained in the hypothetical, the VE then opines as to whether there exist any jobs in the national economy that meet claimant's physical and mental needs.

In the present case, the ALJ determined Claimant's RFC to be sedentary with a sit/stand option; with occasional postural movements; with use of the hands primarily for gross grasping strength; with no repetitive over head reaching; with no foot pedals; with no hazards; with unskilled and low stress work (which the ALJ defined as including entry level work with one to two step processes and routine and repetitive tasks dealing primarily with things, not people). (Tr. 33).  The sit/stand option was derived from the  RFC Assessment performed by Dr. Blake and Dr. Mace on 2/29/04 which concluded that Claimant is unable to sit or stand for more than 15-30 minutes at one time.  (Tr. 727).

During the hearing the ALJ asked the VE whether there existed a significant number of jobs in the national economy for Claimant's age, education, past relevant work and exertional limitations.  The VE responded in the affirmative to the ALJ's inquiry and cited two jobs - a surveillance system monitor and an inspector and marker.[6]  (Tr. 82).  It is the Court's finding that the ALJ's analysis at Step Five was not faulty.

---

[6] Claimant brings to this Court's attention the fact that the second job cited by the VE - inspector, with a DOT number of 559687074 - is characterized as "light" work in the DOT, which contradicts the Claimant's RFC of sedentary level work.  (Tr.  88).  Pursuant to SSR 00-4p, the ALJ has a duty to resolve incompatibilities between a job's characterization in the DOT and the individual's RFC.  SSR 00-4p (2000).  However, as explained in the Ruling, an ALJ may reasonably rely on the VE's explanation as to how the job meets the claimant's RFC despite having a contrary DOT listing, as the DOT is but one source of information as to a job's demands and requirements - the VE's training and experience is another.  Id.  Accordingly, the ALJ reasonably relied on the VE's representation that in his training and experience, the job as inspector/marker met the Claimant's RFC.  (Tr.  82).

First, neither the fact that the ALJ failed to provide details as to Claimant's sit/stand need nor the fact that the VE failed to explicitly detail how the jobs satisfied Claimant's sit/stand needs warrant a remand. As held by the Fourth Circuit, it is reasonable to presume the VE understood "sit/stand option" to mean that Claimant needed to be able to sit or stand at will. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002); see, also, Zawrkowski v. Barnhart, 417 F. Supp. 2d 758, 762 (D.S.C. 2006); see, also, Perkins v. Apfel, 101 F. Supp. 2d 377-78 (D. Md. 2000). While it would have been helpful, it was not necessary for the ALJ to provide further specifics about Claimant's sit/stand needs in her hypothetical.

Second, there is no merit to Claimant's argument that the hypothetical posed by the ALJ insufficiently represented Claimant's limitations.[7] It is within the province of the ALJ to determine Claimant's limitations (based on the evidence before the ALJ). Sullivan, supra, 907 F.2d at 1456; SSR 96-5p (1996). So long as the ALJ's determination is supported by substantial evidence, it will be supported. Id. The ALJ explained in detail how she considered the report from Claimant's treating physician (Dr. Mace) and - for reasons relating to credibility and consistency within the report - chose not to give the report substantial weight. (Tr. 31). Additionally, the ALJ properly noted that a significant percentage of the medical evidence documented Claimant's "normal" ranges of mental and physical health such that Claimant likely did not suffer from the degree of limitations imposed by Dr. Mace. (Tr. 456, 462, 482, 492, 507, 642, 643). Accordingly, the ALJ's decision to include and exclude specific limitations is supported by substantial evidence.

---

[7] Claimant specifically directs this Court's attention to medical records from Claimant's treating physician, Dr. Mace, that include additional limitations such as reclining or laying down with feet up and having frequent rest periods during the day. (Tr. 725).

Finally, there is no merit to Claimant's argument that the jobs cited by the VE did not accommodate Claimant's needs. While it is true that the two jobs cited by the VE were largely nullified by the more restrictive limitations posed by Claimant's attorney (Tr. 89, 90), the ALJ was not required to accept the answers given by the VE under the circumstances of the attorney posing a hypothetical to a VE that included more restrictive limitations than those originally decided upon by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1986). Additionally, the ALJ provided reasons for why she chose not to include the additional limitations included in Dr. Mace's report. (Tr. 725). As she explained, the limitations set forth by Dr. Mace were "significantly contrary to other medical evidence and findings such as those noted by the reviewing physicians, consulting physicians, the pain clinic physician and the neurologist."[8] (Tr. 31, 725). Consistent with the ALJ's observations, numerous medical records document that Claimant fell within the normal range mentally and physically and did not suffer from the degree of limitations imposed by Dr. Mace. (Tr. 456, 462, 482, 492, 507, 642, 643). Accordingly, the ALJ was reasonable in rejecting the limitations proposed by the attorney and was thereafter reasonable in relying on the VE's representation as to the availability of alternative jobs in the national economy.

## IV. Recommendation

---

[8] The ALJ's basis for discounting portions of Dr. Mace's report also stem from the ALJ's observation that Dr. Mace concluded Claimant was disabled from September 1999 through the "present," a time period during which the ALJ noted Claimant had been gainfully employed. (Tr. 31). Upon closer examination of Dr. Mace's report, it is unclear whether Dr. Mace's determination as to disability pertained to the date of September 6, 1999 (as the ALJ alleged) or the date of October 12, 2002 (as it's written on the report). This Court need not resolve the issue, however, as the ALJ provided numerous other reasons for failing to rely on Dr. Mace's report aside from Dr. Mace's allegedly "faulty" determination of Claimant's period of disability.

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED.

2.       Commissioner's Motion for Summary Judgment be GRANTED.  The ALJ properly determined that Claimant's obesity - alone or in combination with other impairments - was not a severe impairment and did not meet or equal a Listing.  Furthermore, the ALJ's characterization of Claimant's sit/stand need was proper.  Finally, the ALJ's hypothetical posed to the VE was proper and the ALJ reasonably relied on the VE's affirmative response as to the availability of jobs in the national economy.   In this case, there is substantial evidence to support the ALJ's decision such that it should be affirmed.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 20, 2007

                              /s/ James E. Seibert
                              JAMES E. SEIBERT
                              UNITED STATES MAGISTRATE JUDGE